IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, ) | Cause No. CR-08-153-BLG-RFC |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER DENYING MOTION** |
| ) | **TO SUPPRESS** |
| **WENDELL DEAN KOPP**, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**I.   INTRODUCTION**

Defendant Wendell Dean Kopp is charged in a Superseding Indictment with various methamphetamine and gun crimes, including one count of conspiracy to possess with intent to distribute meth, possession with intent to distribute meth, two counts of possession of a firearm in furtherance of drug trafficking, and two counts of possession of a stolen firearm.  *Doc. 23*.

Pending before the Court is Kopp's Motion to Suppress (*Doc. 45*), through which he argues that all evidence seized as a result of a November 12, 2008 traffic stop must be suppressed because there was insufficient justification for the stop. An evidentiary hearing was held on May 21, 2010.  For the following reasons, Kopp's motion must be denied.

## II.     FACTS

The following facts are compiled from testimony at the May 21, 2010 hearing and from police reports attached to the Government's opposition brief.

Officer Gilluly of the Billings, Montana Police Department was working the afternoon shift on November 11, 2008. While driving North on 6th Ave. West in Billings around 10:00 p.m. he observed a black Thunderbird parked in a church parking lot. A person was in the driver's seat, later determined to be Defendant Wendell Dean Kopp.

Aware of recent church burglaries in Billings and knowing that Billings Municipal Code (§ 18-701) prohibits parking in business parking lots after hours, Gilluly decided to investigate. As his patrol car entered the lot, the Thunderbird drove off, passing Gilluly as it exited the same way Gilluly had entered. Gilluly was able to make out the license plate number and related this information to dispatch. At some time, dispatch related that the Thunderbird was registered to a Tanya Benjamin. Gilluly then followed the Thunderbird around the corner saw that it had parked in front of 546 Avenue E, an apartment complex across the alley from the church parking lot. Officer Gilluly parked his patrol car a few houses down and watched as Kopp exited the vehicle, walked up to 546 Avenue E, and knocked on the front door.

When the knocking achieved no response, Kopp began to look in the windows. Gilluly advised dispatch that he was investigating a suspicious person, he knew this would summon a cover officer, and pulled up behind the Thunderbird. He then shined his spotlight on Kopp and asked him to come to his patrol car. Kopp asked what he had done wrong. Gilluly said that Kopp was acting suspiciously and that it was illegal to park in a business parking lot after hours. Gilluly testified that Kopp was acting nervously and looking all around, as if he were looking for a route to flee. Kopp, however, did not flee, but told Gilluly he was there to see a friend. On account of Kopp's suspicious behavior, Gilluly patted him down and told him to sit on the curb. Gilluly felt a cell phone in Kopp's pocket, but did not remove it.

Kopp verbally identified himself and Gilluly recognized the last name "Kopp." There was some confusion between Gilluly and dispatch as to whether his name was Wendell or Dean, the latter being Kopp's middle name, but it is unclear whether this confusion was caused by Kopp giving his name as Dean Kopp, or whether the confusion was caused by dispatch. Regardless, the confusion over Kopp's name was resolved in three to five minutes, during which time dispatch advised Gilluly that there was an "officer caution" on Kopp and that Kopp had a recent drug history. Within the first three minutes, Kopp had also given conflicting answers to Gilluly's questions. For example, Kopp had said he did not

-3-

know who owned the cell phone that he was using or the car that he was driving. Because of the officer caution, his own recognition of Kopp's name, and his suspicious behavior, Gilluly placed Kopp in handcuffs. Kopp was told that while he was not being arrested, he was being detained. The cover officer had arrived on the scene by this time.

Gilluly then questioned Kopp about what he was doing in the area. Kopp said that Star Rexford lived at the house and that he had been texting her from the church parking lot and that she had told him to come over. When asked why she did not respond, Kopp said she must not be home. Gilluly verified that a person named Star Rexford lived at that residence but his knocks on the door did not garner a response.

When Gilluly returned to Kopp, who was still in handcuffs seated on the curb, he saw that Kopp was doing something with a cell phone behind his back. Gilluly took the phone and put it on the lid of the trunk. Gilluly continued to question Kopp, and Kopp said that he did not know the phone number of the phone he was using because it belonged to Star Rexford. Gilluly eventually asked dispatch to contact Star Rexford. Dispatch responded that they had contacted Rexford's father and that he was on the way.

Noticing several items in the car that might be burglary tools, Gilluly asked Kopp for permission to search the car, but Kopp declined consent. On account of Kopp's drug history and all the circumstances of the encounter, Gilluly summoned a canine.

Sometime thereafter, Rexford's father arrived and succeeded in getting her to answer the door. Gilluly then questioned Rexford at her front door. At first she said that she did not know Kopp, but after looking at him again recognized him as "Dean," Kopp's middle name. Gilluly testified that Rexford may not have recognized Kopp at first because it was dark and he was some distance away. When asked, Rexford said that the cell phone Kopp claimed was hers was not and that she does not really know Kopp, but just knows him from "the neighborhood, you know the Southside." Further questioning revealed inconsistencies in her stories and when Gilluly questioned her about the inconsistencies, she became defensive.

While Gilluly was speaking with Rexford, Kopp remained at the curb with the cover officers. Kopp's phone was ringing constantly during the time. Gilluly returned to Kopp after speaking with Rexford and asked him if he could answer the phone. Gilluly answered the phone and spoke with a woman who asked for Kopp. Gilluly told her that Kopp was unavailable and asked whose phone she had called.

The female would not answer the question and hung up after she said that Gilluly sounded like a cop.

As Gilluly advised Kopp that he was going to write him a citation, presumably for being in the parking lot of a closed business, Officer Vickery, also with the Billings Police Department, arrived with his canine. After the canine indicated the presence of illegal drugs within the Thunderbird, Kopp was told that the vehicle would be impounded, but that he would be free to go as soon as Gilluly completed the citation. Gilluly told Kopp that since neither he nor Rexford claimed ownership of the cell phone, it would be left inside the impounded Thunderbird. Gilluly testified that from the time that he first summoned Kopp to his vehicle until the canine indicated on the Thunderbird, between 15 and 20 minutes elapsed.

A subsequent search of the Thunderbird revealed methamphetamine.

### III.   ANALYSIS

The Fourth Amendment's prohibition of unreasonable searches and seizures applies to all seizures of a person, even if the seizure involves only a brief detention that does not constitute an arrest. *United States v. Johnson,* 581 F.3d 994, 999 (9th Cir. 2009). Officer Gilluly could lawfully detain Kopp briefly for investigative purposes so long as Gilluly had "reasonable suspicion that criminal

activity may be afoot." *Id., quoting Terry v. Ohio*, 392 U.S. 1, 30 (1968). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Id.* (internal quotations omitted). In determining whether Gilluly had reasonable suspicion, the court must consider the totality of the circumstances surrounding the *Terry* stop, referencing the "collective knowledge of the officers involved, and the inferences reached by experienced, trained officers." *Id.*

First, the Court assumes that the initial contact with Kopp–when Gilluly shined his spotlight on him and summoned him to his patrol car–was a seizure because a reasonable person in Kopp' situation would not feel free to disregard Gilluly and go about his business. *Florida v. Bostick,* 501 U.S. 429, 434 (1991). Regardless, considering the totality of the circumstances, by this time Gilluly had reasonable suspicion that Kopp was violating provisions of the Billings Municipal Code prohibiting prowling, section 18-701, and driving in parking lots of closed business, section 24-342. Those sections provide:

Sec. 18-701. Loitering or prowling.

A person commits a violation if he loiters or prowls in a place, at a time, or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity.

> Among the circumstances which may be considered in determining whether such alarm is warranted is the fact that the actor takes flight upon appearance of a peace officer, refuses to identify himself, or manifestly endeavors to conceal himself or any object. Unless flight by the actor or other circumstance makes it impracticable, a peace officer shall prior to any arrest for an offense under this section afford the actor an opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and explain his presence and conduct. No person shall be convicted of an offense under this section if the peace officer did not comply with the preceding sentence, or if it appears at trial that the explanation given by the actor was true and, if believed by the peace officer at the time, would have dispelled the alarm. A violation of this section is a misdemeanor with the penalties set forth in section 1-110.
>
> Sec. 24-342. Driving in parking lots restricted.
>
> Except for the purposes of parking, leaving after parking or leaving a passenger or picking up a passenger at an open business, no person shall drive any motor vehicle across, through, into or out of any parking lot anywhere in the city. This section shall apply both to privately owned and publicly owned parking lots. This section shall not apply to any person acting with the express written or verbal permission of the owner or person in charge of the parking lot.

Pursuant to City Code § 1-110, failure to comply with the mandatory provisions of the City Code subjects a person to a misdemeanor conviction punishable by six months imprisonment and a $500 fine.

Considering the recent church burglaries, Gilluly was justified in determining whether Kopp had a legitimate reason to be in the church parking lot. *See* § 24-342. And when Kopp drove away as soon as Gilluly's patrol car entered the parking lot, Gilluly was justified in following him to determine whether Kopp's

presence in the area warranted alarm for the safety of persons or property in the vicinity.  *See* § 18-701.  In addition, by the time Gilluly made any real contact with Kopp, he had seen him knock on the door, receive no response, and look in the windows of an apartment building adjacent to the parking lot he was waiting in.  In the eyes of an experienced police officer, Kopp could have been casing the apartment for a burglary.  Accordingly, the Fourth Amendment did not prohibit Gilluly from summoning Kopp to his vehicle to determine the reasons for his suspicious activity.

Once Gilluly had lawfully stopped Kopp, Gilluly was free to question Kopp about anything he wanted to without further reasonable suspicion of wrongdoing, so long as the questioning did not prolong the duration of the stop.  *United States v. Mendez,* 476 F.3d 1077, 1080 (9th Cir. 2007).  On the other hand, if Gilluly's initial contact created further reasonable suspicion of criminal activity, then he is free to question him longer.  In this Court's view, Kopp suspicious behavior continued throughout the encounter and justified further detention until Gilluly could dispel his suspicions.

Although it was not unreasonable for Kopp to ask why Gilluly had stopped him, Gilluly testified that Kopp was acting nervously and looking around, perhaps for an escape route. Although even acting "extremely nervous" around police is not

enough to turn a *Terry* stop into extended questioning, Gilluly had other particularized, objective factors that justified continued questioning. *United States v. Chavez-Valenzuela,* 268 F.3d 719, 726 (9th Cir. 2001) *overruled on other grounds by Muelhler v Mena,* 544 U.S. 93 (2005). Moreover, because he reasonably suspected Kopp may be armed and dangerous, his pat down of Kopp's exterior clothing was reasonable. *Johnson,* 581 F.3d 999. The fact that Gilluly allowed Kopp to keep the cell phone in his pocket is further proof that the pat search was for purposes of officer safety rather than evidence gathering.

Once in handcuffs, Kopp continued his suspicious behavior. In response to questioning about his activities in the area, he said that he had been texting Star Rexford from the church parking lot and that she had asked him to come over. While this does not seem unusual, when asked why she did not respond to his knocking, Kopp said that she must not be home. Officer Gilluly was then required to spend a few minutes confirming that a person named Star Rexford lived at that residence. In attempt to validate Kopp's story, Gilluly spent more time knocking on Rexford's door, but she would not answer.

Unable to contact Rexford and dispel his suspicions about the suspected prowler, Gilluly returned to find Kopp trying to text people with his hands behind his back. Kopp then reiterated that he did not know the number of the phone he

was using because it belonged to Rexford. This prompted a call to dispatch to see if they could contact Rexford.

By this time, Gilluly had seen what could be burglary tools, including gloves and channel lock pliers, in the front seat. He asked for Kopp's consent to a search of the Thunderbird, but Kopp declined. This, combined with Kopp's drug history and his suspicious, prowling behavior, led Gilluly to call dispatch for a canine. Gilluly testified that he called for a canine within five or six minutes of stopping Kopp.

Shortly thereafter, Rexford's parents arrived and were able to get her to come to the door. After questioning Rexford for a few minutes, Gilluly was finally able to confirm that Kopp and Rexford did in fact know each other. Rexford, however, gave confusing answers as to why she was texting with Kopp and became defensive when Gilluly questioned her about the confusing answers. Gilluly, however, had confirmed that Kopp and Rexford knew each other and that Kopp was probably not casing Rexford's apartment for a burglary.

When Gilluly returned to Kopp, still handcuffed at the curb, he learned that the cell phone had been ringing constantly. When he told Kopp that Rexford said the cell phone was not hers, Kopp said that it was his. With Kopp's permission, Gilluly eventually answered the phone, but the caller hung up when it suspected

that Gilluly was a police officer. Around this time, the canine officer arrived and the canine indicated the presence of illegal drugs within the Thunderbird. Although the vehicle was detained pending a search warrant, Kopp was set free.

As the foregoing indicates, Kopp's detention from the time of initial contact until the canine indicated on the Thunderbird was justified by articulable facts, which combined with Gilluly's training and experience as a police officer, to create reasonable suspicion of criminal activity. The seizure was therefore justified and Kopp's motion to suppress must be denied.

Finally, the Court also notes Gilluly's testimony that Kopp's detention lasted no more than 20 minutes from the time Kopp was seized at the apartment door until the canine indicated on the Thunderbird. In the Ninth Circuit, this is not an unreasonably prolonged detention. *See United States v. Turvin,* 517 F.3d 1097, 1101-02 (9th Cir. 2008) (upholding fourteen minute detention during a traffic stop). In determining whether a traffic stop is unreasonably prolonged, courts consider the totality of the circumstances surrounding the stop to determine whether the officer's conduct was reasonable. *Turvin*, 517 F.3d at 1101. As detailed above, the totality of the circumstances compel the conclusion that Gilluly's conduct was reasonable and the 20-minute detention was not unreasonably prolonged.

## IV.  CONCLUSION

For those reasons, **IT IS HEREBY ORDERED** that Kopp's Motion to Suppress (*Doc. 45*) is **DENIED.**

Dated this 24th day of May 2010.

>                     _/s/ Richard F. Cebull_____
>                     Richard F. Cebull
>                     United States District Judge